In a letter dated May 11, 2016, OLTC informed Snyder it had investigated an incident of alleged abuse against her, determined the allegation was valid, and was issuing a "Founded Report" against her. Snyder was informed of her right to appeal the ruling, which she did, and in a decision dated December 30, 2016, the DHS hearing officer upheld the OLTC decision finding abuse. Snyder then appealed to circuit court, which affirmed the finding of abuse and the placement of Snyder's name on the Registry. Snyder now appeals that decision to our court.
Administrative Hearing Testimony and Evidence
In a prepared statement to the hearing officer, OLTC representative Barbara James stated that OLTC received a report on May 6, 2016, that Snyder, a CNA at Sherwood, had abused SM while adjusting a blood-pressure cuff by forcefully moving SM's right arm to hold it down and then jerking her arm in a forward motion two or three times to the degree SM's wheelchair rocked back and forth. Based on that information, OLTC determined the allegation of abuse was founded.
At the agency hearing, Dawn Bearden, a registered nurse and director of nursing at Sherwood at the time of the incident, testified she reviewed the video of Snyder attempting to obtain the blood-pressure reading from SM and confirmed there was inappropriate treatment by Snyder. Bearden said Snyder was having difficulty placing the cuff and jerked SM's right arm several times to straighten it; SM's wheelchair was physically moved due to the force used by Snyder. Bearden's stated definition of abuse was physical harm to a patient, which included infliction of pain; based on what she saw on the video, Bearden *774 believed SM experienced pain as a result of Snyder's actions.
On cross-examination, Bearden admitted Snyder was a caring CNA who never had an allegation of abuse made against her before this incident. Bearden stated that after the incident, a body audit was performed on SM, which revealed no bruising or discoloration; likewise, x-rays of SM's right arm and shoulder were also negative. Bearden explained that while SM had some rigidity, it was not to the point where her arm had to be "yanked" in order to provide care, and the video showed very aggressive jerking of SM's arm. While she agreed there was no physical evidence of injury, such as bruising, fractures, or a break in the skin, Bearden nevertheless concluded SM had suffered physical abuse at the hands of Snyder because, in her professional medical opinion, SM suffered pain from Snyder's actions.
On redirect examination, Bearden explained that while SM was resistant to treatment at times based on her dementia, there was a care plan in place when a patient was resistant, which was to back away and allow the patient time to calm down and then reattempt the care after the patient's agitation has subsided. Bearden remained steadfast in her belief there was physical evidence of maltreatment of SM because her arm was jerked on multiple occasions so forcefully that her wheelchair moved, which was sufficient in her mind to rise to the level of abuse.
Gerlonda Porter, who worked in housekeeping at Sherwood, observed the incident between Snyder and SM. She said she saw Snyder "yank" SM's arm while attempting to take her blood pressure, and when she "yanked it really hard" a second time, Porter asked Snyder why she did that. Snyder told Porter she did it because SM was fighting back, but Porter testified SM was not fighting back. Porter stated she heard SM make a sound like the pulling of her arm hurt her; she asked SM if she was okay after the incident, and SM shook her head. This incident concerned Porter enough that she felt she had no choice but to report it to Dalphine Webb, the charge nurse; Porter also spoke to Renee Phillips, Sherwood's administrator, as a result of the incident, and she reiterated to Phillips what she had written in her statement-she saw Snyder yank SM's arm and when she asked Snyder why she did it, Snyder told her that SM was fighting back. Porter said she had never seen Snyder neglect or abuse any other resident, but it was her opinion Snyder appeared to be frustrated in the video.
Nathan Rivers, who also worked in housekeeping at Sherwood, testified he was in the hallway with SM, Porter, and Snyder when the incident occurred. He heard Porter ask Snyder why she was yanking SM's arm, but he did not see the incident. After Rivers watched the video of the incident, he said there was an obvious jerk, and Porter asked why Snyder was jerking SM's arm. Rivers said SM had "an angry look" on her face, but he did not recall that she made any sounds.
Dalphine Webb, a registered nurse and the shift supervisor at Sherwood the day of the incident, testified she was told of the interaction between SM and Snyder by a staff member who reported Snyder was yelling at SM and "snatching" on her. When Webb asked Snyder what was going on, Snyder told her SM was being difficult about the placement of the blood-pressure cuff so she "snatched" her arm. Webb asked Snyder if she had "snatched" SM's arm, and Snyder replied yes, because SM was being difficult. Webb then told Snyder to write a witness statement, clock out, and leave the premises because that conduct was patient abuse. Webb made this decision prior to seeing the video, but she *775 stated that viewing the video reinforced her conclusion Snyder's actions constituted abuse. Webb explained that while there were difficult patients, the employees were there to protect the residents; and while some patients were difficult at times, you had to walk away if things were not "going like they need to go." Webb had a body audit performed on SM and had x-rays taken of SM's shoulder due to the incident; while she could not recall the results of the body audit, she stated the x-rays were negative for fractures or dislocation. Webb stated Snyder appeared to be a caring CNA, and there were no other reports of abuse or neglect regarding Snyder. Webb admitted she did not talk with SM, and she received no reports SM was crying or moaning or that she was upset or distressed; however, Webb said SM would not have volunteered that she was hurting. Webb's determination was based on Porter's report and Snyder's interview; she said anytime you "snatch" a patient, that is abuse, and when Snyder candidly admitted to her she had "snatched" SM's arm, Webb took it at face value and concluded SM had been abused.
Charla Renee Phillips, Sherwood's administrator, testified she was obligated to report abuse and neglect to OLTC as well as to local police. She said she received a report of an allegation of abuse involving Snyder from Webb; reviewed the video; and based on her review, concluded there was an episode of alleged abuse that required her to make a report to OLTC. While she considered Snyder to be a hard worker, it was Phillips's opinion Snyder moved faster than she needed to in performing her tasks with the residents; however, Phillips admitted she had never received any reports accusing Snyder of abuse or neglect. While she was required to also notify the police department as a part of her investigation, Phillips admitted Snyder had not been arrested in connection with the incident.
Snyder moved for a directed-verdict after Phillips's testimony, which was denied. Snyder testified on her own behalf. As she viewed the video, Snyder explained she placed the blood-pressure cuff on SM's forearm and had to reposition SM's arm because her arm tended to retract. Snyder stated it was absolutely necessary to take SM's blood pressure. Snyder stated she never saw any physical injury to SM, nor did she hear SM make any sounds or make any facial expressions that made her think her actions had placed SM in some type of pain. Snyder claimed she did not intentionally abuse SM.
On cross-examination, Snyder disagreed that SM's arm could have been repositioned at a later point in time; she claimed she had never seen an actual written care plan until the incident with SM, and she denied she had been trained regarding the particular treatment of SM. She said she just needed to raise SM's arm to position the blood-pressure cuff on her arm. Snyder explained she had not applied for other CNA jobs since her termination from Sherwood because she had learned prior to the incident she had been hired at UAMS to be a patient-care technician. After her testimony, Snyder rested and renewed her motion for directed verdict, which was denied by the hearing officer.
In his order, the hearing officer found the testimony of Porter, Rivers, and Webb credible; he did not find Snyder's testimony credible. He found that Snyder had jerked SM's arm in an inappropriate manner; SM suffers from Alzheimer's and dementia and is noncommunicative; the jerking of SM's arm would reasonably cause pain; the video footage and testimony of the nurses appeared to show the physical harm SM experienced at the hands of Snyder;
*776 and there was sufficient evidence Snyder had abused SM.
Circuit Court Proceedings
Snyder appealed the hearing officer's decision to circuit court. Both Snyder and DHS made arguments to the circuit court. While the circuit court stated after viewing the video there was certainly a de minimis response to the jerking, the jerking of SM's arm was abrupt and "way out of line." The circuit court affirmed the hearing officer's decision finding the allegation of abuse to be founded.
Standard of Review
On appeal, our review is directed toward the decision of the administrative agency rather than the decision of the circuit court. Gildehaus v. Arkansas Alcoholic Beverage Control Bd. , 2016 Ark. 414, 503 S.W.3d 789. The review of administrative decisions is limited in scope. Ahmad v. Arkansas State Med. Bd. , 2018 Ark. App. 111, 542 S.W.3d 224. The standard of review to be used by both the circuit court and the appellate court is whether there is substantial evidence to support the agency's findings. W.N. v. Arkansas Dep't of Human Servs. , 2018 Ark. App. 346, 552 S.W.3d 483. The administrative agency's decision is afforded considerable deference in part because these agencies are better equipped by specialization, insight through experience, and more flexible procedures than courts to determine and analyze legal issues affecting their agencies. Gildehaus, supra. The Administrative Procedures Act (APA) provides that a court may reverse or modify an agency's order when the agency's findings, inferences, conclusions, or decisions are (1) in violation of constitutional or statutory provisions; (2) in excess of the agency's statutory authority; (3) made upon unlawful procedure; (4) affected by other error or law; (5) not supported by substantial evidence of record; or (6) arbitrary, capricious, or characterized by an abuse of discretion. Ark. Code Ann. § 25-15-212(h) (Repl. 2014); Williform v. Arkansas Dep't of Human Servs. , 2018 Ark. App. 314, 551 S.W.3d 401.
Default Judgment
Snyder first contends she should have been awarded a default judgment against DHS because of its failure to timely file the record on appeal in the circuit court. Arkansas Code Annotated section 25-15-212 (d)(1) provides:
Within thirty (30) days after service of the petition or within such further time as the court may allow but not exceeding an aggregate of ninety (90) days, the agency shall transmit to the reviewing court the original or a certified copy of the entire record of the proceedings under review.
In a motion for extension of time to file the record, filed on March 10, 2017, DHS stated its director had been served with a copy of Snyder's petition for review on February 6, 2017, making the certified administrative record due to be filed on or before March 8, 2017.[1] In this motion, DHS requested two extra days to file the record. Snyder resisted DHS's motion and moved for default judgment. On March 15, 2017, the circuit court found good cause existed for a two-day extension and no prejudice was shown by the grant of the two-day extension. The circuit court denied Snyder's request for a default judgment in an order filed on April 20, 2017.
*777 Snyder argues she was entitled to a default judgment because DHS failed to file the record within thirty days. She is incorrect. First, agency actions governed by the APA are exempt from the Arkansas Rules of Civil Procedure, which do not apply to administrative proceedings. Ford v. Keith , 338 Ark. 487, 996 S.W.2d 20 (1999) ; Arkansas Dep't of Human Servs. v. Campbell , 87 Ark. App. 206, 189 S.W.3d 495 (2004) (citing Whitlock v. G.P.W. Nursing Home, Inc. , 283 Ark. 158, 672 S.W.2d 48 (1984) ). Therefore, default judgment is not an appropriate remedy for an appeal from an administrative proceeding.
Additionally, the statute clearly provides that the circuit court may allow up to an aggregate of 90 days in which to transmit the entire record of the agency proceeding that is being reviewed. Snyder does not argue DHS failed to transmit the entire record within the 90-day limitation of the statute. The circuit court allowed more than 30 days but less than 90 days, which conforms with the statute. We find no error on this point.
Commission of Abuse
Snyder next argues her conduct did not rise to the level of abuse as defined by the statute. With regard to any long-term-care facility resident, "abuse" is defined as
(i) Any intentional and unnecessary physical act that inflicts pain on or causes injury to an endangered person or an impaired person, excluding court-ordered medical care or medical care requested by the patient or long-term care facility resident or a person legally authorized to make medical decisions on behalf of the patient or long-term care facility resident.
(ii) Any intentional act that a reasonable person would believe subjects an endangered person or an impaired person, regardless of age, ability to comprehend, or disability, to ridicule or psychological injury in a manner likely to provoke fear or alarm, excluding necessary care and treatment provided in accordance with generally recognized professional standards of care.
Ark. Code Ann. § 12-12-1703 (1)(A)(i) & (ii) (Supp. 2017).
Snyder contends repositioning of SM's arm was at times necessary because her arms would retract from rigidity due to her medical conditions. She argues there were no visible signs of physical injury-no bruising, discoloration, skin breaks, or fractures-and although the police were called, no charges were filed. Snyder further asserts no witness reported seeing or hearing any reaction from SM that would indicate she suffered pain from the maneuvering of her arm.
Snyder is incorrect when she asserts no witnesses reported seeing or hearing any reaction from SM that would indicate she suffered pain from the incident. Gerlonda Porter specifically stated she heard SM make a sound like it hurt when Snyder yanked her arm; when she asked SM if she was okay after the incident, SM shook her head. Porter was concerned enough about the incident that she felt compelled to report it to both Webb and Phillips.
Giving the evidence the strongest probative force in favor of the agency's decision, Arkansas Public Employees Retirement System v. Taylor , 2013 Ark. 37, 425 S.W.3d 738, and because the hearing officer's decision will be upheld if there is any substantial evidence to support it, C.C.B. v. Arkansas Department of Health & Human Services , 368 Ark. 540, 247 S.W.3d 870 (2007), we affirm the agency's finding of abuse. While it is true there was no *778 physical injury,[2] we hold the evidence supports the finding that Snyder's actions inflicted pain on SM. While Snyder testified she did not intend to intentionally abuse SM, she did intend to pull SM's arm to reposition it, to the point that her actions moved SM's wheelchair when she pulled on her arm. Snyder told Webb she "snatched" SM's arm because SM was resisting her. Such an action was unnecessary, since there were protocols in place to deal with dementia patients, including returning later to perform the medical treatment. Furthermore, the hearing officer found Snyder's testimony was not credible, while finding Porter, Rivers, and Webb's testimony to be credible. Given the testimony and our standard of review, we hold there is substantial evidence to support the hearing officer's finding that the allegation of abuse was founded.
Harshness of Punishment
Snyder's last argument is that her punishment-being placed on the Adult and Long-Term Care Facility Resident Maltreatment Central Registry-is too harsh. We do not reach this argument because it was not preserved. Snyder did not raise this issue to the DHS hearing officer. "It is essential to judicial review under the Administrative Procedures Act that issues must be raised before the administrative agency appealed from or they will not be addressed by this court." Sarna v. Arkansas Dep't of Corr. Sex Offender Comm. , 2017 Ark. App. 684, at 4, 537 S.W.3d 312, 314 (citing Parkman v. Sex Offender Screening & Risk Assessment Comm. , 2009 Ark. 205, at 23-24, 307 S.W.3d 6, 20 ). See also Gildehaus, supra. Because Snyder failed to raise this issue before the administrative agency, it cannot now be addressed on appeal.
Even if Snyder had preserved this issue, given our affirmance of the hearing officer's finding of abuse, this issue must be affirmed as well. Arkansas Code Annotated section 12-12-1716(a)(3)(B) (Repl. 2009) states: "An offender's name shall be placed in the registry if upon completion of the administrative hearing process, the department's investigative determination of founded is upheld." The statute makes it mandatory for Snyder's name to be placed on the registry; no lesser punishment is permitted, a fact conceded by Snyder's counsel during oral argument.
Affirmed.
Vaught and Hixson, JJ., agree.

DHS filed a second extension-of-time motion on April 10, 2017, requesting additional time to submit a copy of a video of the incident; Snyder made no objection to this motion.

Counsel for DHS conceded at oral argument this case was not the most egregious case of abuse that has been perpetrated in a long-term-care facility.